COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| M. JAVED IQBAL, M.D. | § | No. 08-10-00172-CV |
| Appellant, | | |
| | § | Appeal from the |
| v. | | |
| | § | County Court at Law Number Three |
| JACOB RASH, INDIVIDUALLY, AND | | |
| AS GUARDIAN OF THE ESTATE OF | § | of El Paso County, Texas |
| HEIDI HAYES, AN INCAPACITATED | | |
| PERSON, BARBARA D. HAYES, AND | § | (TC# 2009-4235) |
| KATHERINE NICOLE LEE, | | |
| | § | |
| Appellees. | | |

## O P I N I O N

M. Javed Iqbal, M.D. appeals the trial court's denial of his motion to dismiss Appellees' health care liability case. In two issues on appeal, Dr. Iqbal contends that the expert reports submitted by Heidi Hayes' son and guardian, Jacob Rash, her daughter Katherine Nicole Lee, and her mother, Barbara Hayes, Appellees, were inadequate and fatally deficient to maintain their case.

## BACKGROUND

On February 19, 2007, at approximately 7:20 a.m., emergency medical services arrived at the residence of Heidi Hayes, a 47-year old female, who complained of headache and left-sided weakness and numbness but maintained clear and normal speech. At 8:10 a.m., Heidi was transported to the emergency room at Providence Memorial Hospital (Providence) where upon her arrival ten minutes later, Heidi's speech had changed. At 8:45 a.m., Heidi's pupils were unequal. A Code Stroke protocol was initiated, and Dr. Michael Compton, an emergency physician, ordered a CT image of Heidi's head which when read showed "a large right cerebral hemorrhage, with mass-effect, focal midline shift, and related hydrocephalus." At 10:30 a.m., Heidi was transferred to the intensive care unit under the care of Dr. Iqbal.

At 11 a.m., Dr. Iqbal ordered a neurosurgical consultation with Dr. Pacheco but was unable to contact him. At 12:20 p.m., Dr. Iqbal ordered a neurosurgical consultation with Dr. Vasquez, who at 12:30 p.m. returned the call and refused the consult. At 1:30 p.m., a consultation request was made to Dr. Shanker Sundrani, the on-call neurosurgeon. At 2 p.m., Dr. Pacheco returned Dr. Iqbal's call but refused to consult on the case. Fifteen minutes later, Dr. Sundrani returned the call and issued orders to prepare Heidi for evacuation of blood and cerebrospinal fluid from within the brain. At 3 p.m., Dr. Sundrani performed bilateral ventriculostomies on Heidi, with drainage of blood and cerebrospinal fluid resulting in significant reduction of intracranial pressure. Post-procedure CT scans showed gradual improvement of Heidi's cerebral edema and midline shift. Upon her discharge on March 19, 2007, Heidi remained in a vegetative state.

On February 18, 2009, Appellees filed a health care liability suit against Dr. Iqbal and others alleging: (1) that they knew or should have known that time was of the essence and that Heidi's condition required immediate neurological intervention; (2) that they delayed obtaining neurosurgical consultation, care, and treatment for Heidi; and (3) that the delay in neurological care resulted in Heidi's significant brain injury. Consequently, Appellees claimed that Dr. Iqbal was negligent in failing to obtain timely neurosurgical care and treatment for Heidi, and that such negligence was the proximate cause both of Heidi's injuries and damages, including physical pain, mental anguish, disfigurement, medical expenses, loss of earning capacity, and physical impairment, and Appellees' injuries and damages, including mental anguish and loss of the relationship with Heidi.

Appellees timely served expert reports and the *curricula vitae* of Dr. Jacob L. Heller on June 9, 2009, Dr. J. Martin Barrash on June 16, 2009, and Nurse Sharla Shumaker on June 19, 2009. In his motion to dismiss, Dr. Iqbal objected to the sufficiency of each report, asserting that Dr. Heller was not qualified to opine on the standard of care or causation, that Dr. Barrash was not qualified

to opine on the standard of care, and that Nurse Shumaker was not qualified to render any opinions against him as a physician. Dr. Iqbal also asserted that, even if qualified to opine, Dr. Heller's report regarding causation was conclusory and Dr. Barrash's report regarding causation was both conclusory and speculative. Thereafter, Dr. Iqbal filed a separate objection regarding Dr. Heller's report but did not file a separate objection regarding Dr. Barrash.

In response, Appellees claimed that Drs. Heller and Barrash were qualified to opine in this matter and that their reports adequately met the statutory expert-report requirements. Appellees did not respond to Dr. Iqbal's arguments regarding the lack of qualifications of Nurse Shumaker but instead noted that her report applied to the standard of care for Providence.

On May 5, 2010, the trial court heard Dr. Iqbal's motion to dismiss the suit based upon the alleged inadequacy of the experts' reports. Before the hearing, Appellees filed their first supplemental response to Dr. Iqbal's motion, asserting that because Dr. Iqbal allegedly failed to timely object to Dr. Barrash's expert report, he thereby waived his objections to that report. After considering arguments, the trial court denied Dr. Iqbal's motion to dismiss.

## DISCUSSION

Dr. Iqbal raises two issues on appeal. The first contends that the threshold expert reports submitted were deficient, alleging that Drs. Heller and Barrash each failed to identify what neurologic injuries, if any, Heidi suffered from the purported delay in her treatment and, thus, failed to address causation as to the relationship between Dr. Iqbal's alleged negligence and Heidi's injuries. And the second issue asserts both that Dr. Heller is not qualified to render opinions on the standard of care, breach of that standard, and causation, and that Dr. Barrash is not qualified to opine on the requisite standard of care in this case.

*Standard of Review*

We review under an abuse-of-discretion standard a trial court's determination on whether a physician is qualified to offer an expert opinion in a health care liability claim. *Otero v. Richardson*, 326 S.W.3d 363, 366 (Tex. App. – Fort Worth 2010, no pet.). A trial court's decision to grant or deny a motion to dismiss under Section 74.351 is also reviewed for an abuse of discretion. *See American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Tenet Hospitals, Ltd. v. Boada*, 304 S.W.3d 528, 533 (Tex. App. – El Paso 2009, pet. denied). We will only find an abuse of discretion if the trial court acted in an unreasonable or arbitrary manner, without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Boada*, 304 S.W.3d at 533. A trial court acts arbitrarily and unreasonably if it could have reached only one decision, but instead reached a different one. *See Teixeira v. Hall*, 107 S.W.3d 805, 807 (Tex. App. – Texarkana 2003, no pet.); *Boada,* 304 S.W.3d at 533. To that end, a trial court abuses its discretion when it fails to analyze or apply the law correctly. *In re Sw. Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex. 2007), *citing In re Kuntz*, 124 S.W.3d 179, 181 (Tex. 2003); *Boada*, 304 S.W.3d at 533.

*Waiver*

Initially, we address Appellees' Reply Issue Three, in which they contend Dr. Iqbal waived any objections to Dr. Barrash's report. Specifically, Appellees assert that because Dr. Iqbal failed to file a separate objection to Dr. Barrash's report, as had been filed regarding Dr. Heller's report, he waived any objections thereto. We disagree.

Sections 74.351(a) and (b)(2) of the Texas Medical Liability Act provide:

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected

parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.

(b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

. . .

      (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a)(b)(2) (West 2011). Subsections 74.351(a) and (b), when read together, prohibit a physician or health care provider from seeking to dismiss upon the basis of the expert reports until the 120-day service deadline has passed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) & (b) (West 2011). Consequently, in circumstances where a claimant serves an expert report early in the 120-day time frame such that a physician's or health care provider's 21-day deadline for filing objections thereto also falls within the 120-day period, the physician or health care provider must necessarily file objections separate from a motion to dismiss, which is not yet permitted. *Id.* Here, Appellees served Dr. Barrash's report two days before the 120-day deadline passed and acknowledge that Dr. Iqbal, a mere fourteen days later but well after the passage of the 120-day deadline, timely filed his motion to dismiss wherein he clearly stated his objections to the sufficiency of Dr. Barrash's qualifications and report. Consequently, Dr. Iqbal was not required to file his objections to Dr. Barrash's report separately rather in a motion to dismiss. Moreover, Appellees fail to identify any cases holding that such objections are not permitted to be raised in a motion to dismiss. Accordingly, we hold that Dr. Iqbal properly preserved his objections to Dr. Barrash's expert report.

**Expert Qualifications**

We next consider the experts' qualifications (Issue Two) and the sufficiency of their reports (Issue One), in that sequence. In Issue Two, Dr. Iqbal contends that Dr. Heller is unqualified to opine on the standard of care, breach of the standard, and causation, and that Dr. Barrash lacks the requisite expertise to render opinions on standard of care. We disagree.

*Applicable Law*

To qualify as an expert witness regarding the standard of care in a suit involving a health care liability claim against a physician for injury to or death of a patient, Section 74.401 establishes that the person must be a physician who: (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(A), 74.401(a)-(c) (West 2011). In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and is actively practicing medicine in rendering medical care services relevant to the claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c) (West 2011).

To qualify as an expert on causation, the medical expert need not practice in the same specialty as the defendant. *Roberts v. Williamson*, 111 S.W.3d 113, 122 (Tex. 2003). Rather, the expert simply must be a physician "who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(C), 74.403(a) (West 2011). Rule 702 of the Texas Rules of Evidence states that "[i]f

scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702; TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(C), 74.403(a) (West 2011); *see also Quiroz ex rel Quiroz v. Covenant Health Sys.*, 234 S.W.3d 74, 86 (Tex. App. – El Paso 2007, review denied); *Burns v. Baylor Health Care Sys.*, 125 S.W.3d 589, 593 (Tex. App. – El Paso 2003, no pet.), *citing E.I. du Pont de Nemours & Co. v. C.R. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Whether an expert is qualified is a preliminary question for the trial court. *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 410 (Tex. App. – Fort Worth 2003, no pet.). The proponent must prove the expert witness possesses special knowledge as to the actual subject on which he is offering an opinion. *Burns*, 125 S.W.3d at 593.

Nevertheless, not every licensed doctor is automatically qualified to testify on every medical question. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). Thus, the trial court's inquiry should not focus on the specialty of the medical expert. *Roberts*, 111 S.W.3d at 122. Instead, the trial court should determine whether the proffered expert has "knowledge, skill, experience, training, or education" regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Broders*, 924 S.W.2d at 153-54 (applying Texas Rule of Evidence 702); *Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App. – Houston [14th Dist.] 1999, no pet.). Therefore, a medical expert from one specialty may be qualified to testify if he has practical knowledge of what is customarily done by practitioners of a different specialty under circumstances similar to those at issue in the case. *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App. – Houston [1st Dist.] 2002, pet. denied). Indeed, if the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care. *Id.*;

*Blan*, 7 S.W.3d at 745. However, the proffered medical expert's expertise must be evident from the four corners of his report and *curriculum vitae*. *See generally Palacios*, 46 S.W.3d at 878; *Christus Health Southeast Texas v. Broussard*, 267 S.W.3d 531, 536 (Tex. App. – Beaumont 2008, no pet.).

*Application - Dr. Heller*

From the four corners of his report and *curriculum vitae*, we are informed that Dr. Heller: (1) was practicing medicine as an emergency department staff physician in Washington and serving as a Clinical Associate Professor at the University of Washington Department of Medicine both at the time his report was prepared and at the time the claim in this suit arose; (2) is specifically familiar with the standard of care for, and is experienced in treating, patients presented to the emergency department with acute intracerebral hemorrhage and significant neurological impairment as involved in this claim; and (3) is experienced in working with neurosurgeons in their diagnosis and management of patients with intracerebral hemorrhage due to stroke, and is board certified as a diplomat in both internal and emergency medicine.[1] We find Dr. Heller's report coupled with his *curriculum vitae* adequately establish his expertise to state both the standard of care applicable to Dr. Iqbal in relation to his care of Heidi and his departure, if any, therefrom. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(A), 74.401(a),(c) (West 2011); *see Dingler v. Tucker*, 301 S.W.3d 761, 769 (Tex. App. – Fort Worth 2009, pet. denied) (the applicable standard of care and an expert's ability to opine thereon is governed by the medical condition raised by the claim and the expert's familiarity and experience with that condition).

In addition to the credentials and experience which render him qualified to opine on the standard of care, Dr. Heller is also familiar with the consequences of delay in diagnosing and treating

---

[1] Dr. Heller states that the standard of care for treating patients with acute intracerebral hemorrhage is a national one.

intracerebral hemorrhage caused by a hypertensive stroke. These credentials and this experience, as set forth in Dr. Heller's report and *curriculum vitae*, sufficiently establish that he is qualified to render an opinion on causation in this case. TEX. R. EVID. 702; TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(C), 74.403(a) (West 2011); *Broders*, 924 S.W.2d at 153-54; *Palacios*, 46 S.W.3d at 878. Thus, the trial court did not abuse its discretion in determining Dr. Heller to be qualified as an expert.

*Application - Dr. Barrash*

Dr. Iqbal contends that Dr. Barrash is unqualified to opine on the standard of care in this case.[2] Having completed his residency training in neurological surgery in 1972, the four corners of his report and *curriculum vitae* reveal that Dr. Barrash: (1) both at the time his report was prepared and at the time the claim in this suit arose, was a practicing neurosurgeon and a Clinical Assistant Professor of Neurosurgery at Baylor College of Medicine, where he trained residents in neurosurgery, which includes the diagnosis and treatment of intracerebral hemorrhage caused by stroke; (2) is familiar with the accepted standards of care applicable to emergency physicians, internists, and hospital staff for obtaining on-call neurosurgical consultation when a patient needs immediate care as here; and (3) is board certified in neurological surgery, is educated, trained, and experienced in the diagnosis and treatment of intracerebral hemorrhage caused by stroke and ventriculostomy to reduce intracranial pressure due to stroke, is experienced in treating patients presented to the emergency department with acute intracerebral hemorrhage and significant neurological impairment as involved in this claim, is familiar with the effects of a timely

---

[2] On appeal, Dr. Iqbal initially identifies his second issue as including a challenge to Dr. Barrash's qualification to opine on causation but subsequently presents argument and authority solely regarding Dr. Barrash's alleged lack of expertise to render standard-of-care opinions against him. As Dr. Iqbal has presented no argument regarding Dr. Barrash's qualifications to opine on causation as preliminarily identified in his second issue on appeal, that issue is waived. TEX. R. APP. P. 38.1(h); *see Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983).

ventriculostomy for treating intracerebral hemorrhage, and assists neurosurgeons in surgery involving conditions relevant to those in this case. As with Dr. Heller, within the four corners of Dr. Barrash's report and *curriculum vitae* we find to be sufficiently established Dr. Barrash's expertise to state both the standard of care applicable to Dr. Iqbal in relation to his care of Heidi and his departure, if any, therefrom. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(A), 74.401(a)-(c) (West 2011); *Palacios*, 46 S.W.3d at 878; *Dingler*, 301 S.W.3d at 769. We therefore conclude that the trial court did not abuse its discretion in determining Dr. Barrash to be qualified to render an opinion regarding the standards of care relevant to the issues in this case. Finding no abuse of discretion in the trial court's denial of Dr. Iqbal's motion to dismiss on these grounds, Issue Two is overruled.

## Expert Reports

In Issue One, Dr. Iqbal complains that Drs. Heller's and Barrash's reports are insufficient to establish causation as the reports fail to explain how his conduct proximately caused harm to Heidi. We disagree.

### *Applicable Law*

If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, a trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West 2011). The definition of an expert report requires that the report contain a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.

CODE ANN. § 74.351(r)(6) (West 2011). As the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document. *Palacios*, 46 S.W.3d at 878.

In setting out the expert's opinions on each of the required elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort. *Id*. at 879. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Id*. And second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id*. Thus, if a report does not meet these purposes and omits any of the statutory requirements, it does not constitute a good faith effort. *Id*. Nor does a report that merely states the expert's conclusions about the standard of care, breach, and causation fulfill these purposes. *Id*. Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

However, a plaintiff need not present evidence in the report as if it were actually litigating the merits. *Palacios*, 46 S.W.3d at 879. The report can be informal, that is, the information contained in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id*.

*The Causation Element*

Dr. Iqbal asserts that Dr. Heller's and Dr. Barrash's expert reports are each inadequate because they fail to explain how his alleged standard-of-care breach caused injury to Heidi or resulted in a different neurologic outcome for her.

An expert report provided under Section 74.351 should explain how the defendant's action or inaction caused injury. *Bowie Memorial Hospital*, 79 S.W.3d at 53. A court is not permitted to fill in gaps in an expert report by drawing inferences or guessing as to what the expert likely meant

or intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App. – Austin 2007, no pet.). Furthermore, causation may not be inferred. *Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App. – El Paso 2008, no pet.). However, Section 74.351(i), in part, permits a claimant to utilize separate expert's reports regarding different issues, such as liability and causation, arising from the conduct of a physician. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i) (West 2011). We read such reports together to determine whether they adequately address the standard of care, breach of the standard, or causation as applicable. *See Tenet Hosp. Ltd. v. Barnes*, 329 S.W.3d 537, 542 (Tex. App. – El Paso 2010, no pet.) (multiple expert reports were read together to determine whether, in combination, they sufficiently discussed the standard of care, breach of the standard, and causation).

Dr. Iqbal does not challenge the sufficiency of the reports regarding either the standard of care or breach of that standard. Consequently, we address those elements only to the extent necessary to aid in our determination of whether the required causation element is adequately addressed within and between the experts' reports.

Dr. Heller noted that Heidi's CT scan, taken at 9:20 a.m., showed a large right cerebral hemorrhage, with mass effect, focal midline shift, and related hydrocephalus, and Dr. Barrash noted that the scan revealed a hemorrhage and the impression that it was caused by hypertension. Dr. Barrash explained that intracerebral hemorrhage and edema may disrupt and compress adjacent brain tissue, leading to neurological dysfunction, and that substantial displacement of brain parenchyma may cause elevation of intracranial pressure and potentially fatal herniation syndromes. In Heidi's case, Dr. Barrash stated that decompression was urgently needed and that urgent decompression by ventriculostomy is deemed necessary to reduce pathologically elevated pressure in the brain by removing the cerebral spinal fluid. According to Dr. Barrash a ventriculostomy, which can be performed at bedside or in the emergency room and does not require the use of an operating room,

is a highly effective procedure involving the drilling of a hole into the skull, passing a tube into a ventricle, and draining the cerebral spinal fluid out to stabilize the intracranial pressure to normal.

Heidi was under Dr. Iqbal's care at 10:30 a.m. According to Dr. Heller, the standard of care dictated that Dr. Iqbal obtain emergent neurosurgical consultation for Heidi by both calling the consultant and having a conversation with the consultant. Under this standard of care, Dr. Iqbal was required to first contact the on-call consultant, here, Dr. Sundrani, before consulting another physician because "that [other] physician is not obligated to be reachable, and any attempt to contact such an individual is likely to result in an unacceptable delay in proper care for the patient requiring the consultation." Per the standard of care, Dr. Iqbal should have waited no longer than 15 minutes for his call to be returned from an unavailable consultant before utilizing additional resources to obtain the necessary consultation.

According to Dr. Barrash, Dr. Iqbal should have immediately called Dr. Sundrani when Heidi was transferred to his care as the standard of care required an immediate neurological consultation with the on-call neurosurgeon. Dr. Iqbal's attempts to contact other neurosurgeons who declined to see Heidi "only delayed the necessary decompression."

Dr. Iqbal waited three hours before requesting a neurological consultation with Dr. Sundrani. Dr. Sundrani performed the necessary ventriculostomies forty-five minutes after receiving a status report on Heidi's condition.[3] Subsequent CT scans showed gradual improvement of Heidi's cerebral edema and midline shift. Drs. Heller and Barrash agree that Dr. Iqbal breached the standard of care required in Heidi's circumstances.

---

[3] While we find to be speculative Dr. Barrash's comment that "[h]ad the on-call neurosurgeon been called, he or she would have come in and performed a ventriculostomy within approximately an hour after the call was returned," we do not find that it renders the remainder of his report deficient for any purpose. Indeed, Dr. Sundrani did perform the ventriculostomy within one hour after returning the call regarding Heidi's condition. It is that fact, rather than the speculative comment, which we have considered in our analysis of the reports.

Dr. Heller concludes in his report that Dr. Iqbal's breach of the standard of care was among those which proximately caused the delay in the performance of the bilateral ventriculostomies which relieved the intracranial pressure in Heidi's head and would have prevented significant neurological deficits. According to Dr. Heller, time was of the essence in performing the ventriculostomies to prevent neurological damage and as a result of the breaches of the standard of care, the unrelieved pressure in Heidi's brain caused ischemia, tissue death, and neurological deficits. He opines that based on a greater than 50 percent chance of medical probability that had emergent consultation been obtained from the on-call neurosurgical consultant, Dr. Sundrani, Heidi's neurological outcome would have been substantially improved since the delay in the ventriculostomy to reduce the intracerebral pressure was directly responsible for her neurological deficits. In his report, Dr. Barrash opines that, had Dr. Sundrani been timely called, he would have performed the ventriculostomies, thereby preventing neurological damage to Heidi and reducing the severity of her neurological injury. He concludes that Dr. Iqbal's breach was among those causing Heidi's neurological damage and preventing the severity of her neurological injury.

We find Drs. Heller's and Barrash's reports sufficiently establish in a non-conclusory manner the necessary causation element by linking Dr. Iqbal's standard-of-care breach, a three-hour delay before consulting with the on-call neurosurgeon, who performed the immediately necessary ventriculostomies within an hour of his initial consultation, to the causation of Heidi's injury, namely, ischemia, tissue death, and neurological deficits and damage, and the prevention of the severity of her neurological injury. The reports set forth the bases of the statements therein to link the conclusions to the facts, and are not conclusory. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Adeyemi v. Guerrero*, 329 S.W.3d 241, 245 (Tex. App. – Dallas 2010, no pet.) (expert's report, which opined that two-day delay in identifying brain hemorrhage significantly increased the risk of

a "worsening" of an intercranial hematoma, that based on a reasonable medical probability, a CT scan would have detected the hemorrhage, that because nurses and physicians failed to timely detect lesions and bleeding in the patient's head, she did not receive proper medical attention which in reasonable medical probability increased the chances of the patient suffering seizure and sustaining significant neurological damages, and that the nurses' and physicians' breaches of the standard of care proximately caused patient's injuries, which included neurological complications, was held to be non-conclusory as report sufficiently addressed causation by stating what physician should have done and what happened upon the physician's failure to perform those acts).

The reports contain a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by Dr. Iqbal failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Palacios*, 46 S.W.3d at 878-79. Because they inform Dr. Iqbal of the specific conduct called into question and provide the trial court a basis upon which it may conclude that Appellees' claims have merit, Dr. Heller's and Dr. Barrash's reports constitute objective good faith efforts to comply with the definition of an expert report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2011); *Palacios*, 46 S.W.3d at 878. Therefore, the trial court was not required to grant Dr. Iqbal's motion to dismiss and did not abuse its discretion in denying the motion. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West 2011); *Walker*, 111 S.W.3d at 62. Issue One is overruled.

## CONCLUSION

Having overruled Issues One and Two, the trial court's judgment is affirmed.

GUADALUPE RIVERA, Justice

June 29, 2011

Before Chew, C.J., McClure, and Rivera, JJ.