

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| TENET HOSPITALS LIMITED, A TEXAS LIMITED PARTNERSHIP D/B/A PROVIDENCE MEMORIAL HOSPITAL, | § § § § | No. 08-13-00290-CV<br><br>Appeal from the<br><br>168th District Court |
| Appellant, | § | of El Paso County, Texas |
| v. | § | (TC# 2012-DCV-03529) |
| LUZ DE LA ROSA AND GILBERT DE LA ROSA, | § § | |
| Appellees. | § § | |

**O P I N I O N**

This case involves a health care liability claim subject to the Texas Medical Liability Act. *See* TEX.CIV.PRAC. & REM.CODE ANN. §74.001-.507 (West 2011 & Supp. 2015). Luz De La Rosa and Gilbert De La Rosa (collectively referred to as the De La Rosas) brought a medical malpractice action against several defendants, including Tenet Hospitals Limited, a Texas Limited Partnership d/b/a Providence Memorial Hospital (Providence). The trial court denied Tenet's challenge to the expert reports served by De La Rosa. We affirm.

**FACTUAL SUMMARY**

The following facts are drawn from the De La Rosas' pleadings and the expert reports. On January 25, 2010, Luz De La Rosa was transported by ambulance to Providence Memorial

Hospital for severe back pain radiating down her right leg. David Gillett, M.D., an emergency room physician, examined her and ordered laboratory studies, morphine for pain, and Levaquin. No radiologic studies were ordered. Luz was admitted to the hospital under the care of Salvador Molina, M.D., a hospitalist, and Mark Landeros, M.D., a surgeon who had recently performed surgery on Luz for breast cancer. Dr. Molina examined Luz on January 26, 2010 and found that she had what he described as "right flank and abdominal pain." That same day, Dr. Landeros ordered a CT scan of the abdomen and pelvis which showed bladder and bowel distention. At 9 p.m., a nurse noted that Luz had weakness in her lower extremities. This information was not reported to any of her physicians.

The following day Luz continued to have severe back pain. Around noon, a nurse notified Dr. Molina that Luz was complaining of "numbness and tingling in her right leg." Dionicio Alvarez, M.D., a kidney specialist, examined her a short time later and noted that she had weakness in her lower right leg. Dr. Landeros noted at 4:41 p.m. that he had been called because Luz was complaining of "severe back pain" and "right leg numbness." Dr. Landeros observed that her pain was most likely related to nerve compression. At 5:35 p.m., Dr. Molina ordered an MRI of the thoracic and lumbar spine with contrast, but he did not require that the MRI be done immediately.

The following morning, a nurse found that Luz could not move her legs. Dr. Landeros examined her at 8:10 a.m. and found that she could not feel pain or move her legs. He wrote orders to make the MRI "stat" and a neurologist was consulted. Even though Dr. Landeros ordered that the MRI be performed stat, it was not begun until 11 a.m. and it was completed at 12:45 p.m. A radiologist interpreted the MRI at around 1:42 p.m. The MRI showed that a

hematoma had caused spinal cord compression. Luz had surgery to remove the clot around 6:30 p.m. that same day, but sadly she is now a paraplegic.

The De La Rosas filed suit against Providence Memorial Hospital, four of the treating physicians, a physician assistant, and a hospitalist group. This appeal concerns only the suit against Providence. The De La Rosas' original petition alleged the following theories of liability: (1) Providence is vicariously liable for the nurse's negligence in failing to inform Dr. Molina, Dr. Landeros, and the physician assistant of leg weakness; (2) Providence is vicariously liable for the nurse's negligence in failing to expedite the stat MRI; (3) Providence was negligent for failing to have policies and procedures that required the nurses to inform physicians and physician assistants of significant changes in the patient's condition; and (4) Providence was negligent for failing to have policies and procedures for the expediting of emergency radiological studies.

The De La Rosas served the defendants with four expert reports and curriculum vitae of Dr. Laurence Huffman, Dr. J. Martin Barrash, Michael Van Buren Calvin, PA-C, MPAS, and Jodi C. Avalos, R.N., M.S.N. Providence objected to the reports on the grounds the experts were not qualified, the reports did not reference any direct conduct of Providence, and the experts' opinions on the vicarious liability claims were speculative and conclusory. The trial court granted Providence's objections, but it also permitted the De La Rosas to cure deficiencies in their expert reports as to the vicarious liability claims addressed by Dr. Huffman, Dr. Barrash, and Nurse Avalos.

The De La Rosas amended their pleadings to remove their claims for direct liability against Providence. In the Second Amended Original Petition, the De La Rosas alleged that Providence is vicariously liable through *respondeat superior* for the nurses' negligent failure to

inform the patient's physicians and physician assistant of her leg weakness and failure to expedite the stat MRI. The De La Rosas submitted supplemental expert reports of Dr. Huffman, Dr. Barrash, and Nurse Avalos. Providence again objected to the expert reports and moved to dismiss the suit against it. The trial court denied the motion to dismiss.

## ADEQUACY OF THE EXPERT REPORTS

In its sole issue, Providence contends that the trial court abused its discretion by denying the motion to dismiss because the experts are unqualified and their reports are insufficient, both individually and in combination, with respect to the relevant standard of care, breach, and causation.

### Standard of Review

We review a trial court's ruling on a motion to dismiss under Section 74.351 for an abuse of discretion. *Tenet Hospitals Ltd. v. Barnes*, 329 S.W.3d 537, 540 (Tex.App.--El Paso 2010, no pet.), *citing American Transitional Care Centers of Texas, Inc.v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). An abuse of discretion occurs when the trial court rules in an unreasonable or arbitrary manner without reference to any guiding rules or principles. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015); *Barnes*, 329 S.W.3d at 540-41. When applying the abuse of discretion standard, we are required to defer to the trial court's factual determinations if they are supported by the evidence, but we review the legal determinations *de novo*. *Van Ness*, 461 S.W.3d at 142; *Tenet Hospitals Limited v. Bernal*, 482 S.W.3d 165, 169 (Tex.App.--El Paso 2015, no pet.).

### Expert Report Requirements and the Standard of Review

Section 74.351(a) requires a plaintiff asserting a health care liability claim to serve an expert report for each physician or health care provider against whom a liability claim is

asserted. TEX.CIV.PRAC. & REM.CODE ANN. §74.351(a). A valid expert report under the TMLA must provide: (1) a fair summary of the applicable standards of care; (2) the manner in which the physician or health care provider failed to meet those standards; and (3) the causal relationship between that failure and the harm alleged. TEX.CIV.PRAC. & REM.CODE ANN. §74.351(r)(6) (defining expert report as a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed); *TTHR Ltd. Partnership v. Moreno*, 401 S.W.3d 41, 44 (Tex. 2013); *Bernal*, 482 S.W.3d at 169. A challenge to the sufficiency of the report must be sustained if it does not amount to an objective good faith effort to comply with the statutory requirements. TEX.CIV.PRAC. & REM.CODE ANN. §74.351(l).

In considering this issue, we must bear in mind that an appellate court's review of an expert report is limited to the four-corners of the report. *See Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Barnes*, 329 S.W.3d at 541. It is not necessary for an expert report to include a full statement of the standard of care and how the standard of care was breached, but it must explain what care was expected but not given. *Barnes*, 329 S.W.3d at 541. An expert report must represent a good-faith effort to provide a fair summary of the expert's opinions. *Id.* A report is a good faith effort if it (1) provides adequate information to inform the defendant of the specific conduct the plaintiff has called into question; (2) provides a basis for the trial court to conclude that the claims have merit; and (3) does not contain a material deficiency. *Bernal*, 482 S.W.3d at 169, *citing Van Ness*, 461 S.W.3d at 141-42.

*Failure to Notify of Change in Patient's Condition*

- 5 -

We beginning by examining the experts' reports as they apply to the claim based on the nurses' alleged failure to verbally notify the doctors and physician assistant that Luz was experiencing lower extremity weakness. The expert reports of Dr. Huffman and Nurse Avalos address this claim. Section 74.351(i) permits a claimant to utilize separate expert's reports regarding different issues, such as liability and causation, arising from the conduct of a health care provider. TEX.CIV.PRAC. & REM.CODE ANN. §74.351(i); *Iqbal v. Rash*, 346 S.W.3d 827, 835 (Tex.App.--El Paso 2011, no pet.). In our review of the trial court's ruling, we will read multiple reports together to determine whether they adequately address the standard of care, breach of the standard, or causation. *Iqbal*, 346 S.W.3d at 835; *Barnes*, 329 S.W.3d at 542.

## 1. <u>The Nursing Standard of Care</u>

Providence first asserts that Dr. Huffman is not qualified by training or experience to offer an expert opinion on nursing standards of care in a hospital inpatient setting. An expert who gives opinion testimony regarding whether a health care provider departed from accepted standards of health care must be qualified to testify under Section 74.402 of the Civil Practice and Remedies Code. TEX.CIV.PRAC. & REM.CODE ANN. §74.351(r)(5)(B). To testify about the accepted standards of care, a person must: (1) be practicing in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider; (2) possess knowledge of accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) be qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care. TEX.CIV.PRAC. & REM.CODE ANN. §74.402(b); *Wissa v. Voosen*, 243 S.W.3d 165, 170 (Tex.App.--San Antonio 2007, pet. denied).

Dr. Huffman is board certified in family practice, emergency medicine, and geriatric medicine, and he also has a Masters degree in health care administration. His supplemental expert report reflects that he taught nurses a course entitled "The Health Care System" at the College of the Ozarks, and the course work included nursing standards of care. Dr. Huffman, who began practicing medicine in 1973, has been caring for hospitalized patients for most of his career and he interacts with nurses on a regular basis regarding the care of his patients. Dr. Huffman states in his supplemental report that a physician relies on the nurses to keep him informed of the hospitalized patient's condition because the physician cannot be with the patient the entire day, and nurses are expected to make a timely notification of a significant change in the patient's condition. His supplemental report specifically states that "[t]imely notification is the standard of care." Although a physician is not automatically qualified to offer an opinion on the standard of care a nurse must follow, a physician can be qualified to offer an opinion on the nursing standard of care if he is familiar with the nursing standard of care because he has taught courses to nurses and he has worked with and interacted with nurses. *See Baylor Medical Center v. Wallace*, 278 S.W.3d 552, 558 (Tex.App.--Dallas 2009, no pet.). This is especially true in this case because the nursing standard of care directly involves the interaction between a nurse and physician in the hospital inpatient setting and the communication expected by a physician from a nurse regarding a hospitalized patient. A physician who regularly cares for hospitalized patients can be expected to be familiar with this particular nursing standard of care  We conclude that the trial court did not abuse its discretion by finding Dr. Huffman qualified to offer an opinion on the nursing standard of care because Dr. Huffman's curriculum vitae, expert report, and supplemental report demonstrate that he is familiar with the applicable nursing standard of care in a hospital inpatient setting, he has taught courses to nurses, and he has worked with and

interacted with nurses in the hospital inpatient setting. *See Hall v. Huff*, 957 S.W.2d 90, 100 (Tex.App.--Texarkana 1997, pet. denied)(physician was qualified to testify as expert about nursing standards of care where he had taught nursing courses, including management of critical care patients, and had testified about nursing standard).

Even if we agreed with Providence and found Dr. Huffman unqualified to testify about the nursing standard of care, Nurse Avalos addressed the standard of care in her expert report:

> The standard of care required that the nurse personally inform one of Mrs. De la Rosa's physicians or the physician assistant of Mrs. De la Rosa's lower extremity weakness as this weakness is an ominous sign in a patient like Mrs. De la Rosa with severe back pain. All nurses should understand that lower extremity weakness in a patient with back pain could be a sign of compression of a spinal nerve or of the spinal cord itself. The standard of care requires that the nurse speak with one of Mrs. De la Rosa's physicians or the physician assistant shortly (sic) as soon as practical after the weakness is detected. Speaking as soon as practical after the weakness is detected is required to assure that the information is timely passed on and not lost as the nurse's attention is focused on another problem. The standard of care requires that the nurse document that the physician or physician assistant was informed of Mrs. De la Rosa's lower extremity weakness and the response. There is no documentation that the nurse who detected Mrs. De la Rosa's lower extremity weakness informed anyone of his/her findings. Thus, the nurse who detected Mrs. De la Rosa's lower extremity weakness breached the standards of care.

Providence concedes in its brief that Nurse Avalos was qualified to offer an opinion on the nursing standard of care, but it maintains that her report and Dr. Huffman's report regarding the standard of care are conclusory and speculative because they fail to distinguish between the standard of care for a doctor, who is responsible for diagnosing a patient, with that of a nurse, who has no statutory duty to engage in any acts of medical diagnosis. We disagree. The reports clearly identify the standard of care as requiring a nurse to timely and personally notify the physician or physician assistant of a significant change in the patient's condition. In this regard, the reports are neither conclusory nor speculative because they provide a fair summary of the care that was expected but not given. *See Barnes*, 329 S.W.3d at 542-43 (expert reports of

- 8 -

doctor and nurse adequately articulated standard of care where doctor's report stated that patient's physician should have been notified immediately by nurse and efforts should have been made to stabilize patient following angiogram, and nurse's report stated that nurse should have immediately notified physician of a significant change in patient's condition where patient's blood pressure was low following angiogram).

## 2. Breach of the Nursing Standard of Care

Providence next contends that the reports of Dr. Huffman and Nurse Avalos are conclusory and speculative with respect to the nurses' alleged breach of the standard of care. Nurse Avalos's supplemental report sets forth the facts on which she based her conclusion that the nurses who noted Luz's lower extremity weakness did not personally report it to the physicians or physician assistant. She stated the following in Paragraphs H through K of her supplemental report:

> H. In my review of Mrs. De La Rosa's medical records for her admission to Providence Memorial Hospital on January 26, 2010, I could find no documentation that a physician was called about the lower extremity weakness noted by the nurse on January 26th, no documentation that a physician called back, no documentation of orders being given, no documentation of no orders being given and no documentation of additional attempts to contact a physician.
> I. Based on the total absence of any of the documentation described above in ¶¶B and C, I am certain that the nurse who found weakness in Mrs. De La Rosa's lower extremities on January 26th, did not notify the physician as the standard of care required and thus, breached the standard of care.
> J. In my review of Mrs. De La Rosa's medical records for her admission to Providence Memorial Hospital on January 26, 2010, I could find no documentation that a physician was called about her lower extremity weakness noted by the nurse on January 27th, no documentation that a physician called back, no documentation of orders being given, no documentation of no orders being given and no documentation of additional attempts to contact a physician.
> K. Based on the total absence of any of the documentation described above in ¶¶ B and C, I am certain that the nurse who found weakness in Mrs. De La Rosa's lower extremities on January 27th at 10:15 p.m., did not notify the physician as the standard of care required and thus, breached the standard of care.

Nurse Avalos's report is neither speculative nor conclusory as it pertains to the alleged breach of the nursing standard of care. We conclude that the expert reports submitted by the De La Rosas adequately addressed the breach of the nursing standard of care applicable to this claim because they demonstrate the care that was expected but not given. *See Barnes*, 329 S.W.3d at 542-43.

### 3. Causation

The next issue is whether the expert reports sufficiently addressed causation. An expert report cannot be conclusory and it must provide a fair summary of the causal relationship between the failure of a health care provider to meet the standards of care and the injury, harm, or damages claimed. *Estorque v. Schafer*, 302 S.W.3d 19, 27 (Tex.App.--Fort Worth 2009, no pet.). The report must explain the basis of the expert's statements regarding causation and link the expert's conclusions to the facts. *Tenet Hospitals Ltd. v. De La Riva*, 351 S.W.3d 398, 403 (Tex.App.--El Paso 2011, no pet.); *Estorque*, 302 S.W.3d at 27-28. A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that absent said act or omission, the harm would not have occurred. *De La Riva*, 351 S.W.3d at 403; *Barnes*, 329 S.W.3d at 543. There can be no analytical gap between a breach of the standard of care and the ultimate harm. *Barnes*, 329 S.W.3d at 543. An appellate court is not permitted to fill in gaps in a report by drawing inferences or guessing what the expert meant or intended. *De La Riva*, 351 S.W.3d at 404.

Dr. J. Martin Barrash, a board certified neurosurgeon, addressed causation in his original and supplemental reports.[1] In his original report, Dr. Barrash stated that it was his opinion, based on reasonable medical certainty, that if an MRI had been taken of the patient's spine during the emergency room visit and examination, a spinal cord hematoma would have been detected early

---

[1] It is unnecessary to address Providence's argument that Dr. Huffman was unqualified to offer an opinion on causation.

and she would have made a complete recovery, suffering no permanent injury to her spinal cord with timely surgery. He explained that once spinal cord compression begins to cause symptoms, the damage usually progresses from reversible to minimal to substantial. Dr. Barrash stated in his supplemental report that the nurses' failure to personally notify one of the physicians or physician assistant of lower extremity weakness on January 26, 2010, and then again on January 27, 2010, caused a delay in the diagnosis of the spinal cord compression. In his opinion, Luz would not have become paraplegic if an MRI had been performed on January 26 or 27 because the hematoma would have been discovered and surgery could have been performed to remove the hematoma causing pressure on the spinal cord. Dr. Barrash opined that lower extremity weakness in a patient like Ms. De La Rosa is an ominous sign which requires that an MRI be performed within "a very few hours."

Providence argues that Dr. Barrash's report "is speculative because it improperly presupposes that a phone call from the nurses about leg weakness would have caused the physicians to immediately reach a correct diagnosis and to then successfully treat Mrs. De La Rosa." It also asserts that Dr. Barrash's opinion that the nurses caused a substantial delay in diagnosis is not supported by an adequate link to the facts. We disagree. Dr. Barrash's opinion on causation must be considered in light of his opinion that the physicians were required by the applicable standard of care to order an MRI upon learning that Luz had developed lower extremity weakness. The nurses observed that she had lower extremity weakness on January 26 and January 27, but they did not personally inform any of her doctors or the physician assistant of this significant finding. Dr. Barrash concluded after reviewing the medical records that none of the physicians were aware that the patient had been experiencing lower extremity weakness until January 28 when she developed paraplegia. Dr. Barrash's conclusion that the nurses'

failure to inform the physicians of the lower extremity weakness caused a delay in ordering an MRI is adequately linked to the facts. We conclude that Dr. Barrash's expert report is sufficient as it pertains to the element of causation on this claim. *See Barnes*, 329 S.W.3d at 543-44 (expert report supplied requisite causal relationship between the breach -- failure to notify the patient's physician -- and the patient's death).

*Failure to Expedite the Stat MRI*

Providence also challenges the sufficiency of the expert reports on the De La Rosas' claim based on the nurses' failure to expedite the stat MRI.

## 1. **The Nursing Standard of Care and Breach**

Nurse Avalos's original and supplemental reports address the nursing standard of care as it applies to the claim based on the nurses' alleged failure to expedite the stat MRI. In paragraph 6 of her original report, Nurse Avalos stated that the patient's development of paraplegia was an emergency situation and there should have been no delay in obtaining the MRI of her spine. The standard of care required that the nursing staff make every effort to obtain the MRI stat, and this effort would include speaking with radiology and explaining the emergency. If radiology was unwilling or unable to receive the patient on a stat basis, the standard of care would have been for the nursing staff to inform Dr. Landeros so that he could intervene. Based on the absence of any documentation of any effort made by the nursing staff to send Luz to radiology as a stat patient, Nurse Avalos concluded that the nursing staff breached this standard of care. Nurse Avalos's expert report is sufficient with regard to the standard of care and breach of the standard. *See Barnes*, 329 S.W.3d at 542-43. Because Nurse Avalos's report is sufficient, it is unnecessary to address the sufficiency of Dr. Barrash's expert report as it pertains to the standard of care and breach.

## 2. Causation

In his supplemental report, Dr. Barrash stated that the failure to obtain a timely MRI and timely perform surgery was the cause of the patient's paraplegia. He added that:

> The delay (failure) to obtain the stat MRI on January 28th, after Mrs. De La Rosa was found to have no movement in her lower extremities, was unconscionable as every effort should have been made by her physicians and nurses to get her immediately to radiology. At that point, time was of the essence. In my opinion the physicians and nurses were equally responsible for the delay, as it seems no one was making any effort to expedite the process.

Providence maintains that Dr. Barrash fails to explain how the hospital staff delayed the MRI or what they could have done to expedite it. This complaint goes to the standard of care and its breach rather than causation. While Nurse Avalos cannot offer an opinion on causation, her report related to the standard of care and breach sets forth the pertinent facts. As already noted, Nurse Avalos described what the nurses should have done, but failed to do, to expedite the MRI. Dr. Barrash's report indicates that the hospital staff did nothing to expedite the MRI, and the delay in obtaining the MRI caused permanent spinal injury. Dr. Barrash's opinion on causation, as set forth in his original and supplemental reports, is an adequate preliminary report because it describes the causal relationship between the breach -- failure to expedite the stat MRI -- and the patient's paraplegia. *See Barnes*, 329 S.W.3d at 543-44. Because the trial court did not abuse its discretion by denying Providence's motion to dismiss, we overrule the sole issue presented and affirm the trial court's order.

ANN CRAWFORD McCLURE, Chief Justice

June 8, 2016

Before McClure, C.J., Rodriguez, J., and Chew, C.J. (Senior Judge)
Chew, C.J. (Senior Judge), sitting by assignment, not participating

- 13 -