

# IN THE
# TENTH COURT OF APPEALS

### No. 10-15-00440-CV

**TEXAS HOME HEALTH SKILLED SERVICES, L.P.**

Appellant

v.

**JUDY ANDERSON, INDIVIDUALLY AND
AS REPRESENTATIVE OF THE ESTATE
OF ELIZABETH TIMMONS, DECEASED,**

Appellees

From the 278th District Court
Walker County, Texas
Trial Court No. 1527363

## MEMORANDUM OPINION

In one issue, appellant, Texas Home Health Skilled Services, L.P., argues that the trial court erred in refusing to dismiss a wrongful-death and survival lawsuit filed by appellee, Judy Anderson, individually and as representative of the estate of Elizabeth

Timmons, deceased, because Anderson failed to serve compliant expert reports. Specifically, appellant complains that Anderson's expert reports failed to establish the qualifications of the doctor writing one of the expert reports and insufficiently addressed the breach and causation elements. Because we conclude that Anderson's expert reports are insufficient as to causation, we reverse and remand.

## I. BACKGROUND

On April 2, 2015, Anderson filed a wrongful-death and survival suit against numerous parties, including appellant. In her first amended petition filed on June 9, 2015, Anderson asserted negligence, vicarious-liability, and gross-negligence claims against appellant pertaining to the death of Elizabeth Timmons. In her live pleading, Anderson alleged the following facts:

> Before April 25, 2014, Elizabeth Timmons was under the care of Dr. Rosenquist, who monitored Ms. Timmons' INR (a measure of blood coagulation) levels. The normal range for INR is 2-3, with higher levels indicating an increased risk of stroke. Ms. Timmons was also under the care of Texas Home Health . . . prior to April 25, 2014, who, along with Dr. Rosenquist was also responsible for monitoring and testing Ms. Timmons' INR levels in addition to her general care. However, prior to April 25, 2014, Ms. Timmons' INR levels were not tested and/or monitored since at least February 26, 2014.

> On April 25, 2014, while at a family member's home. Elizabeth Timmons suddenly became unresponsive. Her daughter, Judy Anderson, immediately admitted Ms. Timmons to Huntsville Memorial Hospital. A physician at Huntsville Memorial Hospital diagnosed Ms. Timmons with a stroke and recommended Ms. Anderson seek care for Ms. Timmons from a neurologist. At Ms. Timmons' admission to Huntsville Memorial Hospital, her INR level was at 15. Later that day, Ms. Timmons was admitted to West Houston Medical Center to receive treatment. While Ms. Timmons was at

West Houston Medical Center, she developed skin breakdown to her legs, sacrum, and back from the inattentiveness of the nursing staff to properly turn Ms. Timmons and/or adequately care for her. The skin breakdown developed into bedsores so severe that Ms. Anderson noticed a pungent odor and the skin breakdown spread over Ms. Timmons' legs, buttocks, and back.

Due to the inattentive and inadequate care Ms. Timmons was receiving at West Houston Medical Center, her daughter had Ms. Timmons transferred to the Huntsville Healthcare Center on May 9, 2014. During Ms. Timmons['] stay at West Houston Medical Center, her condition[] worsened due to the nursing staff's substandard care. Ms. Timmons became dehydrated to such a degree that she developed acute renal failure. Ms. Anderson repeatedly informed the staff of Ms. Timmons' lack of drinking and eating[,] but no interventions were made by the staff to adequately treat and care for Ms. Timmons. In fact, the nursing staff at Huntsville Healthcare Center was providing meat-based meals to Ms. Timmons despite Ms. Timmons being a vegetarian.

Due to Ms. Timmons' worsening condition, she was transferred by EMS to Huntsville Memorial Hospital on May 28, 2014. West Houston Medical Center failed to properly communicate Ms. Timmons' symptoms to Huntsville Memorial Hospital, including, but not limited to Ms. Timmons' lack of eating, and drinking, and her skin breakdown. While at Huntsville Memorial Hospital, Ms. Timmons continued to receive inadequate care for her skin breakdown and nutritional status and needs, including the severe dehydration. As a result, Ms. Timmons suffered kidney failure, was unable to swallow or talk, and her tongue turned black with sores. The combination of a dehydration and prolonged lack of eating caused kidney failure and a progressive decline in Ms. Timmons' condition from which Ms. Timmons was unable to recover, resulting in her death June 7, 2014.

On May 13, 2015, Anderson served the initial expert report and curriculum vitae of Paul O. Warshawsky, M.D. Appellant objected to Dr. Warshawsky's initial expert report, contending that he was not qualified to testify regarding the standard of care

applicable to a home-health nurse and that his report was not a "fair summary" of the applicable standard of care, the alleged breach, and causation.

Thereafter, Anderson served the expert report and curriculum vitae of Lori Rozas, R.N. Anderson explained that this report was provided to address appellant's objections to the qualifications of Dr. Warshawsky to opine on the standard of care for a home-health nurse. In any event, appellant filed objections to Nurse Rozas's expert report, as well as supplemental objections to Dr. Warshawsky's initial expert report.

In response to appellant's objections, Anderson served supplemental reports from both Dr. Warshawsky and Nurse Rozas. However, these supplemental reports were met with additional objections from appellant.

On September 28, 2015, appellant filed a motion to dismiss Anderson's claims against appellant for failure to serve an adequate expert report. On the same day, Anderson filed a motion to determine the sufficiency of her expert reports. Shortly thereafter, Anderson filed a response to appellant's motion to dismiss, arguing that her expert reports were sufficient and requesting, in the alternative, an opportunity to cure any potential deficiencies.

On November 23, 2015, the trial court heard both appellant's motion to dismiss and Anderson's motion to determine the sufficiency of her expert reports. A few days after the hearing, the trial court signed an order denying appellant's motion to dismiss, granting Anderson's motion, and determining that her expert reports were sufficient.

This accelerated, interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West Supp. 2016) (authorizing an interlocutory appeal from the denial of "all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351 . . . .").

## II.  STANDARD OF REVIEW

We review all rulings related to Section 74.351 of the Texas Civil Practice and Remedies Code under an abuse-of-discretion standard. *Jelinek v. Casas*, 328 S.W.3d 526, 538-39 (Tex. 2010); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). Although we defer to the trial court's factual determination, we review questions of law de novo. *See Haskell v. Seven Acres Jewish Senior Care Servs., Inc.*, 363 S.W.3d 754, 757 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *see also Hillcrest Baptist Med. Ctr. v. Dixon*, No. 10-12-00396-CV, 2013 Tex. App. LEXIS 8565, at **4-5 (Tex. App.—Waco July 11, 2013, no pet.) (mem. op.). A trial court has no discretion in determining what the law is, which law governs, or how to apply the law. *See Poland v. Orr*, 278 S.W.3d 39, 45 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *see also Dixon*, 2013 Tex. App. LEXIS 8565, at *5. An abuse of discretion occurs if the trial court fails to correctly apply the law to the facts or if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *see Haskell*, 363 S.W.3d at 757 (citing *Petty v. Churner*, 310 S.W.3d 131, 134 (Tex. App.—Dallas 2010, no pet.)).

### III. APPLICABLE LAW

A plaintiff who asserts a health-care-liability claim, as defined by Chapter 74, must provide each defendant physician or health-care provider with an expert report which provides "a fair summary of the expert's opinions" as of the date of the report regarding the applicable standards of care, the manner in which the care rendered failed to meet the applicable standards, and the causal relationship between that failure and the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6) (West Supp. 2016); *see also Dixon*, 2013 Tex. App. LEXIS 8565, at **5-6. "The purpose of the expert report requirement is to deter frivolous claims, not to dispose of the claims regardless of their merits." *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011).

When a plaintiff timely files an expert report and a defendant moves to dismiss on the basis that the report is insufficient, the trial court must grant the motion only if the report does not represent a good-faith effort to meet the statutory requirements. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *see also Dixon*, 2013 Tex. App. LEXIS 8565, at *6. To constitute a good-faith effort, a report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875; *see Wright*, 79 S.W.3d at 52.

A report cannot merely state the expert's conclusions about these elements; instead, the report must explain the basis of the statements and link the conclusions to

the facts. *Wright*, 79 S.W.3d at 52; *see Jelinek*, 328 S.W.3d at 539-40. A report that merely states the expert's conclusions about the standard of care, breach, and causation is deficient. *Palacios*, 46 S.W.3d at 879. Further, a report that omits any of the statutory elements is likewise deficient. *Id.* In determining whether the trial court's ruling on a motion to dismiss was correct, we review the information contained within the four corners of the report. *Wright*, 79 S.W.3d at 53. "The report can be informal in that the information in the report does not have to meet the same requirements as evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879.

Furthermore, reports may be considered together in determining whether a health-care-liability claimant provided a report meeting the statutory requirements. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *see also Salais v. Tex. Dep't of Aging & Disability Servs.*, 323 S.W.3d 527, 534 (Tex. App.—Waco 2010, pet. denied). A single report need not "address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *see, e.g., Dixon*, 2013 Tex. App. LEXIS 8565, at *11 n.2. But read together, the reports must provide a "fair summary" of the experts' opinions. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see Barber v. Mercer*, 303 S.W.3d 786, 791 (Tex. App.—Fort Worth 2009, no pet.); *Walgreen Co. v. Hieger*, 243 S.W.3d 183, 187 n.2 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

## IV.   ANDERSON'S EXPERT REPORTS

In its sole issue on appeal, appellant contends that the trial court erred in refusing to dismiss this action for failure to serve a compliant expert report. Among the reasons listed by appellant is that the expert reports are conclusory as to the applicable standard of care and breach; that the reports failed to provide specific information as to how appellant's alleged breach of the applicable standards of care was a substantial factor in Timmons' death; and that Dr. Warshawsky is not qualified to opine on the standard of care for home-health-care providers.

## A.   Appellant's expert reports establish Dr. Warshawsky's qualifications

At the outset, we address appellant's complaints about Dr. Warshawsky's qualifications. Section 74.351(r)(5)(C) provides that an "expert" in a health-care liability claim is:

> with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C); *see id.* § 74.403(a) (West 2011) ("[A] person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence."). However, a professional

need not be employed in the particular field about which he is testifying so long as he can demonstrate that he has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify him to give an opinion on that subject. *Broders v. Heise*, 924 S.W.2d 148, 153-54 (Tex. 1996); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402 (West 2011) (listing the requirements for an expert to be considered qualified in a suit against a health-care provider); *see also* TEX. R. EVID. 702 (allowing experts to testify based on their "knowledge, skill, experience, training, or education"). "[W]hen a party can show that a subject is substantially developed in more than one field, testimony can come from a qualified expert in any of those fields." *Broders*, 924 S.W.2d at 154.

Qualifications of an expert must appear in the expert reports and curriculum vitae and cannot be inferred. *See Salais*, 323 S.W.3d at 536; *see also Estorque v. Schafer*, 302 S.W.3d 19, 26 (Tex. App.—Fort Worth 2009, no pet.) (citing *Olveda v. Sepulveda*, 141 S.W.3d 679, 683 (Tex. App.—San Antonio 2004, pet. denied)); *Baylor College of Med. v. Pokluda*, 283 S.W.3d 110, 117 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Analysis of the expert's qualifications under section 74.351 is limited to the four corners of the expert reports and the expert's curriculum vitae. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (requiring a health-care-liability claimant to file both an expert report and the expert's curriculum vitae within 120 days of the filing of the original petition); *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 (Tex. 2008) (considering an expert's curriculum vitae and report in

determining whether the expert was qualified to opine about plaintiff's negligent credentialing cause of action); *Polone v. Shearer*, 287 S.W.3d 229, 238 (Tex. App.—Fort Worth 2009, no pet.); *Pokluda*, 283 S.W.3d at 117; *Mosely v. Mundine*, 249 S.W.3d 775, 779 (Tex. App.—Dallas 2008, no pet.); *see also Lewis v. Funderburk*, No. 10-05-00197-CV, 2008 Tex. App. LEXIS 9761, at *6 (Tex. App.—Waco Dec. 31, 2008, pet. denied) (mem. op.).

Merely being a physician is insufficient to qualify as a medical expert. *See Broders*, 924 S.W.2d at 152; *see also Hagedorn v. Tisdale*, 73 S.W.3d 341, 350 (Tex. App.—Amarillo 2002, no pet.) ("Every licensed doctor is not automatically qualified to testify as an expert on every medical question."). But we defer to the trial court on close calls concerning an expert's qualifications. *See Larson v. Downing*, 197 S.W.3d 303, 304-05 (Tex. 2006); *see also Broders*, 924 S.W.2d at 151 ("The qualification of a witness as an expert is within the trial court's discretion. We do not disturb the trial court's discretion absent clear abuse.").

Dr. Warshawsky's curriculum vitae indicates that he is a board-certified physician who was practicing medicine at the time of the events in question. Indeed, Dr. Warshawsky has practiced medicine for approximately thirty years and is board certified in internal medicine. Furthermore, Dr. Warshawsky has been a medical director of a medical institution with over 175 doctors and nurses and has been on the teaching faculty at a medical school. And more specific to this case, Dr. Warshawsky has served as a hospitalist and physician providing geriatric and nursing-home care at several facilities in Chicago, Illinois, over the course of many years. Additionally, Dr. Warshawsky noted

numerous times in his reports that he is familiar with the standard of care applicable to the health-care providers involved in the claim. *See Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.).[1]

Based on our review of Dr. Warshawsky's reports and curriculum vitae, we conclude that he is qualified to opine on the standard-of-care and breach elements of appellant's claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(C), 74.403(a); *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d at 463; *Broders*, 924 S.W.2d at 153-54; *Salais*, 323 S.W.3d at 536; *Estorque*, 302 S.W.3d at 26; *Pokluda*, 283 S.W.3d at 117; *Wallace*, 278 S.W.3d at 558; *see also Lewis*, 2008 Tex. App. LEXIS 9761, at *6. Thus, we hold that the trial court did not abuse its discretion in determining that Dr. Warshawsky was qualified to opine

---

[1] In *Wallace*, the Dallas Court of Appeals noted the following:

When a physician fails to state in his expert report or affidavit that he has knowledge of the standard of care applicable to the specific types of health care providers involved in the claim, or that he has ever worked with or supervised the specific types of health care providers involved in the claim, the physician is not qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. . . . However, if the physician states he is familiar with the standard of care for both nurses and physicians, and for the prevention and treatment of the illness, injury, or condition involved in the claim, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. . . . Further, if a physician states he is familiar with the standard of care and responsibilities and requirements for physician's assistants, and he has worked with, interacted with, and supervised physician's assistants, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. . . .

*Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.) (citing *Cook v. Spears*, 275 S.W.3d 577, 582-84 (Tex. App.—Dallas 2009, no pet.); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 814 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Simonson v. Keppard*, 225 S.W.3d 868, 872-74 (Tex. App.—Dallas 2007, no pet.)).

on the essential elements in this case. *See Wallace*, 278 S.W.3d at 558; *see also Tenet Hosps, Ltd. v. De La Rosa*, No. 08-13-00290-CV, 2016 Tex. App. LEXIS 6060, at **9-10 (Tex. App.—El Paso June 8, 2016, no pet.) (mem. op.) (concluding that a doctor can opine about the standard of care applicable to nurses, especially when the expert reports demonstrate that the physician "is familiar with the applicable nursing standard of care in a hospital inpatient setting, he has taught courses to nurses, and he has worked with and interacted with nurses in the hospital inpatient setting") (citing *Hall v. Huff*, 957 S.W.2d 90, 100 (Tex. App.—Texarkana 1997, pet. denied)).

And even if we agreed with appellant and found Dr. Warshawsky unqualified to testify about the standard-of-care and breach elements for home-health-care providers, we note that Nurse Rozas also submitted an expert report and curriculum vitae addressing the standard-of-care and breach elements in this case. Moreover, appellant does not challenge Nurse Rozas's qualifications on appeal. Therefore, because we have already concluded that Dr. Warshawsky was qualified to render an expert opinion in this case, and because we may consider multiple reports in determining whether the health-care-liability claimant met the statutory requirements, *see Salais*, 323 S.W.3d at 534, we conclude that Anderson provided qualified experts to opine on the essential elements of her claims.

## B. Appellant's expert reports are adequate as to the standard of care and breach elements

Section 74.351(r)(6) provides that an expert report is:

a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standard, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).  Chapter 74 further provides:

Notwithstanding any other provision of this section, a claimant may satisfy the requirement of this section for serving an expert report by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care providers, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

*Id.* § 74.351(i).

In this case, Anderson provided numerous expert reports from Dr. Warshawsky and Nurse Rozas that addressed the standard-of-care and breach elements.  Specifically, among the copious information contained in his reports, Dr. Warshawsky outlined the following with respect to the standard-of-care and breach elements for appellant:

### Texas Home Health (AccentCare)

The standard of care requires that the home health nurses institute appropriate nursing interventions that might be required to stabilize a patient's condition and/or prevent complications.  The home health records contained documentation that Ms. Timmons was taking an anticoagulant. The appropriate intervention in this case, would be to ensure that the proper lab work was ordered and obtained in order to prevent complications from the Coumadin.  The last documented INR was 4.6 on 2/19/14.  The doctor was notified and requested that the family be called regarding changes in Coumadin dosage.  Yet, there was no follow up to

determine whether this call had occurred and whether there were new recommendations for Coumadin dosage and PT/INR checks. This is below the standard of care. Ms. Timmons was seen the following day by home health but no labs were drawn to recheck the INR. This is below the standard of care. Home health visited Ms. Timmons 8 additional times with no INR check. This is below the standard of care. The last visit took place on 4/21/14. She was hospitalized on 4/25/14 with a severe subdural hematoma. The home health nurses knew that Ms. Timmons was taking Coumadin between 2/19/14 and 4/21/14—and they certainly know that Coumadin is an anticoagulant that can cause uncontrolled bleeding if the PT/INR's are not monitored. This knowledge should have prompted them to communicate with Dr. Rosenquist and to request orders for PT/INR's every time they came out to visit and saw that there had been non recent PT/INR's drawn. Had they done this, it would have quickly been determined that Ms. Timmons's PT/INR levels were higher than the therapeutic range and adjustments would have been made to her Coumadin dosage. This would have prevented the severe bleed that she suffered and her death would have been prevented. Unfortunately, the home health nursing staff did nothing and Ms. Timmons continued to take the Coumadin she had been prescribed. Coumadin prevents the body's clotting mechanisms from working. Its dosage must be tailored to the PT/INR levels—which are a reflection of how impaired the body's clotting mechanisms are. Ms. Timmons was receiving Coumadin for atrial fibrillation. The goal INR for atrial fibrillation is 2.0-3.0. The standard of care required the home health nurses to know this and to call Dr. Rosenquist when they saw that no recent PT/INR levels had been ordered and so that they could be drawn. Failure to do this was below the standard of care. Providing home health nursing care to a patient whom you know is taking Coumadin and for whom you know a PT/INR level has not been drawn once or twice per week without bringing this to the attention of the managing physician is below the standard of care. In this case, continuing to take Coumadin caused Ms. Timmons' clotting mechanisms to become so impaired that she began bleeding uncontrollably which manifested in the very low hemoglobin level and on the CT that showed bleeding in her brain.

Nurse Rozas also provided ample information in her expert report regarding the standard-of-care and breach elements. Citing the Texas Administrative Code, the CMS Conditions of Participation, and case-specific facts from Timmons's medical files, Nurse

Rozas included numerous pages of information pertinent to the applicable elements. A brief summary culled from Nurse Rozas's report regarding the pertinent elements is as follows:

- [Appellant] failed to comply with the CoP Standard of care for initiation of home health services, and completion of the comprehensive assessment for the start of care, which placed the patient at unnecessary risk, and was below the minimum standard of care required.

- [Appellant] failed to meet the standard for drug regimen review and reconciliation at multiple points along the care continuum, placing Elizabeth Timmons at an even greater risk for drug errors, inaccurate medication administration, and serious consequences. This is below the minimal standards of care required.

- [Appellant] placed Ms. Timmons at heightened risk by not demonstrating an accountable process for notifying MD of critical changes in patient status, lack of policy for following receipt, implementation, and communication flow for MD orders, care coordination and communication to staff, MD and patient/CG. The nursing notes for the agency utilize template style information with checklist item choices which do not reflect individualized care or content needed to safely communicate anticoagulant therapy status and monitoring. There is a lack of consistency among clinicians regarding how assessment questions are answered, which may indicate a lack of training, questionable competency, and poor continuity/consistency of care, all of which are significant factors in managing high risk individuals. There are clinician notes showing that patient has Class 1 heart disease, others showing no cardiac issues when she had multiple cardio diagnosis, including HTN, artificial valve and pacemaker. There are notes documenting pt. had wt. loss of 4 lbs, notes showing breathlessness, poor skin turgor, poor appetite, and a myriad of other pertinent reportable signs/symptoms, without evidence that this was communicated to the physician or other staff.

- [Appellant] did not provide any written proof of signed MD orders or process for order workflow for the agency. The patient flowsheet and nurses notes have orders written within, with no formal orders present in the chart. This demonstrates a disorganized process which would

predictably potentiate a negative outcome. This was below the minimal standards of care and a direct violation of state regulation for the practice of home health.

- [Appellant] failed to demonstrate standard principles of practice regarding the establishment of an adequate record of patient care, and as a result, was not able to provide complete and accurate information related to the care of this patient. There are missing lab results, lack of assessment and notes to document care received, and poor facilitation and compilation for the retrieval of information. In the inadequate record received for review, the agency demonstrates application of record keeping that is below minimal standards.

- It is my opinion that during Elizabeth Timmons['] time on service with [appellant], the agency provided care that was below the minimal standards required by state and federal guidelines for the delivery of home health as outlined above. With Ms. Timmons already having a heightened risk and potential for critical events, the dereliction of home health oversight for her case could easily be viewed as predictive indicators for a negative outcome. The patient was a high risk from the initial point of contact, and the failure of the original admitting PT to identify this and coordinate care accordingly, the failure of the agency supervisor to do the same, and the demonstration of continuation of negligible case management and supervisory oversight, are all factors that could have potentially prevented this predictable outcome. There are well established standards of care for both home health provision and specifically for anticoagulant therapy management, for which this agency did not demonstrate compliance. Having stated this, I have outlined the evidence of deficient care that could have lead [sic] to the predictable outcome of Elizabeth Timmons' hospitalization and death. All of my opinions are based upon reasonable nursing probability.

After reviewing the four corners of Anderson's proffered expert reports, we conclude that the reports inform appellant of the specific conduct called into question—appellant's (1) failure to monitor Timmons' consumption of Coumadin; (2) continued dispensation of anticoagulant medication without giving required blood tests to

determine if the medication level was therapeutic or out of range; and (3) alleged poor patient management, including documentation and monitoring. Therefore, based on the foregoing, we further conclude that the trial court was justified in concluding that Anderson's expert reports discuss the standard-of-care and breach elements with sufficient specificity to fulfill the two required purposes: (1) to inform appellant of the specific conduct the plaintiff has called into question; and (2) to provide a basis for the trial court to conclude that the claims have merit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i), (r)(6); *see also Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879.

## C.  **Appellant's expert reports are inadequate with respect to the causation element**

In her brief, Anderson contends that:

The cause of action against the Defendant is that the negligence ascribed to the Defendant in Plaintiff's Original Petition was a proximate cause of the demise of Ms. Timmons. This negligence is simply that this Defendant continued to give Ms. Timmons Coumadin without taking any steps to determine if she had received the required blood testes [sic] (PT/INR) to determine if the Coumadin level was therapeutic or out of range. As a result, she became Coumadin toxic and developed substantial bleeding in her brain which required hospitalization. During this required hospitalization, she developed other complications such as pressure ulcers and dehydration which resulted in her death.

And as noted above, in her live pleading, Anderson stated:

While at Huntsville Memorial Hospital, Ms. Timmons continued to receive inadequate care for her skin breakdown and nutritional status and needs, including the severe dehydration. As a result, Ms. Timmons suffered kidney failure, was unable to swallow or talk, and her tongue turned black with sores. The combination of a dehydration and prolonged lack of eating caused kidney failure and a progressive decline in Ms. Timmons' condition

from which Ms. Timmons was unable to recover, resulting in her death June 7, 2014.

However, in his initial expert report, Dr. Warshawsky noted the following:

Ms. Timmons was taking Coumadin, a prescribed medication used as an anticoagulant. This drug requires consistent monitoring due to the narrow target range required to prevent complications. If appropriate assessment, prevention and interventions had taken place by Dr. Rosenquist and the home health nurses, it is my opinion that Ms. Timmons would not have suffered massive bleeding in the form of a subdural hematoma which required hospitalizations and ultimately led to her death.

. . . .

In this case, the pressure ulcers that were permitted to form on Ms. Timmons was a proximate cause of her declining physical condition and which made her unable to take in adequate fluid and food to sustain life as well as increasing her susceptibility to the effects of dehydration which led to her death.

. . . .

Had appropriate assessment, reporting, and treatment been undertaken to address the potential for dehydration, it is my opinion that Ms. Timmons would not have become dehydrated to the point that she suffered from the above mentioned critical conditions, and required transfer to the hospital for critical care. *Dehydration was the immediate cause of her death.*

. . . .

With reasonable medical probability, the failure of the nursing staff at [appellant] to abide by the accepted standards of care as I have described it within this report caused Ms. Timmons to suffer a coagulopathy which caused significant anemia and an acute subdural hematoma necessitating a prolonged hospitalization during which her physical condition declined and she developed multiple pressure ulcers, severe dehydration, and died. Thus, the negligence of [appellant] was the proximate cause of significant pain and suffering to Ms. Timmons' [sic] and eventually her death.

(Emphasis added).

In his supplemental expert report, Dr. Warshawsky further opined:

The breaches in the standards of care set out above, in my original report, and in Nurse Rozas' reports are linked to avoidable injuries to Mrs. Timmons. Based on reasonable medical probability[,] the failure of [appellant] to provide acceptable home health care was a proximate cause of injuries and damages to Mrs. Timmons. Had appropriate documentation been kept, and follow up and coordination of care been performed[,] Mrs. Timmons would have most probably received appropriate anticoagulant therapy. Lapses in recordation of INR I.E., between 2/19/14 and 4/27/19 [sic] caused no action to be taken to assess and control INR readings. Anticoagulants such as that Mrs. Timmons was taking are high-risk drugs that require regular and constant monitoring. Higher than normal ratios are well understood to cause or contribute to uncontrolled bleed while lower than acceptable rations [sic] are understood to allow clotting and development of emboli. Either of these situations is dangerous and potentially fatal. In reasonable medical probability[,] the breaches listed contributed to the development of the large acute right cerebral subdural hematoma that ultimately contributed to Mrs. Timmons['] death. In this case, continuing to be provided powerful anticoagulants without the monitoring and communication that [appellant] was charged with providing caused Ms. Timmons' clotting mechanisms to become so impaired that she began bleeding uncontrollably. This uncontrolled bleeding then manifested in the very low hemoglobin level and on the CT that showed bleeding in her brain. For a more in-depth analysis of this situation[,] see my original report. In summary, based on reasonable medical probability, had [appellant] provided appropriate care information, appropriate testing, and monitoring would have been performed. If such had been done[,] this information would have been passed on to physicians and the physicians would have modified the anticoagulant therapy to obtained [sic] therapeutic INR reading. Had these events occurred, in reasonable medical probability, the severe brain bleed Mrs. Timmons suffered from and that ultimately contributed to her death would not have occurred. My review of the medical records confirms that there are no other medically reasonable explanations for the unfortunate outcome that befell Mrs. Timmons.

With regard to causation, the Texas Supreme Court has stated:

> An expert cannot simply opine that the breach caused the injury. Stated so briefly, the report fails the second *Palacios* element—it does not give the trial court any reasonable basis for concluding that the lawsuit has merit. . . . An expert's conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit*, which we have consistently criticized. . . . Instead, the expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented. While we have said that no "magical words" need be used to meet the good-faith requirement, mere invocation of the phrase "medical probability" is likewise no guarantee that the report will be found adequate.

*Jelinek*, 328 S.W.3d at 539-40 (internal citations omitted & emphasis in original); *see Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) ("An expert must explain, based on facts set out in the report, *how* and *why* the breach caused the injury." (emphasis in original)).

In this case, Anderson alleged that appellant's nurses failed to monitor Timmons' consumption of Coumadin and, instead, kept giving her the medication without giving required blood tests to determine if the medication level was therapeutic or out of range. *See Regent Health Care Ctr. of El Paso, L.P. v. Wallace*, 371 S.W.3d 434, 441 (Tex. App.—El Paso 2008, no pet.) ("Mere reference to general concepts regarding assessment, monitoring, and interventions are insufficient are a matter of law." (citing *Palacios*, 46 S.W.3d at 873)). This alleged negligence led to Timmons sustaining a subdural hematoma and being hospitalized at different health-care facilities, including Huntsville Memorial Hospital, West Houston Medical Center, and Huntsville Healthcare Center, where she purportedly received inadequate treatment that resulted in kidney failure and

dehydration. *See, e.g., Mendez-Martinez v. Carmona*, No. 08-15-00265-CV, 2016 Tex. App. LEXIS 4243, at *21 (Tex. App.—El Paso Apr. 22, 2016, no pet.) ("A break in the logical chain between the negligent act and the injury renders the causation conclusions in a report insufficient." (citing *Wallace*, 271 S.W.3d at 441; *Clark v. HCA, Inc.*, 210 S.W.3d 1, 11 (Tex. App.—El Paso 2005, no pet.))). Anderson seems to suggest that appellant's actions launched a series of events that eventually contributed to Timmons' death. *See, e.g., Granbury Hosp. Corp. v. Hosack*, No. 10-09-00297-CV, 2010 Tex. App. LEXIS 3132, at **5-7 (Tex. App.—Waco Apr. 28, 2010, no pet.) (mem. op.) (concluding that an expert report was insufficient as to causation when the health-care provider's actions "launch[ed] a series of events that eventually contributed to her death.").[2]

A review of Dr. Warshawsky's expert reports reveals that dehydration was the cause of Timmons' death; however, he failed to explain how Timmons' subdural hematoma was a substantial factor in her death from dehydration. Because Anderson's expert reports fail to connect the occurrence of the subdural hematoma to Timmons'

---

[2] Specifically, in *Granbury Hospital Corporation v. Hosack*, we determined the following:

> In his report, Rushing concludes that LGMC's conduct violated the standard of care by allowing Hall to remain on the bedpan for too long, resulting in the development of pressure ulcers, which released infection and toxins into Hall's system, and launching a series of events that eventually contributed to her death. However, his report indicates that Hall died of cardiorespiratory arrest. Rushing does not explain how Hall's development of pressure ulcers resulted in her cardiorespiratory arrest. Because Rushing's report fails to connect the occurrence of pressure ulcers to Hall's death, his report is insufficient on the element of causation. . . .

No. 10-09-00297-CV, 2010 Tex. App. LEXIS 3132, at *6 (Tex. App.—Waco Apr. 28, 2010, no pet.) (mem. op.).

death, we conclude that Anderson's expert reports are insufficient on the element of causation. *See id.*; *Wallace*, 371 S.W.3d at 441 ("[W]hile the report indicates that the breach of the standard of care resulted in worsening of the described skin conditions, there is no linkage to the cause of death, aside from the assertion of a close temporal proximity between the conditions and the premature death."); *see also Nexion Health at Southwood, Inc. v. Judalet*, No. 12-08-00464-CV, 2009 Tex. App. LEXIS 7404, at *11 (Tex. App.—Tyler Sept. 23, 2009, no pet.) (mem. op.) (concluding that an expert report was deficient on causation because the expert "failed to explain the causal relationship between the decedent's leg fracture and her death;" i.e., "how a fractured leg caused her to experience congestive heart failure"). Accordingly, we sustain appellant's sole issue. *See Tenet Hosps., Ltd. v. Barnes*, 329 S.W.3d 537, 543 (Tex. App.—El Paso 2010, no pet.) ("There can be no analytical gap between a breach of the standard of care and the ultimate harm." (citing *Clark*, 210 S.W.3d at 11)); *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (noting that courts are precluded "from filling gaps in a report by drawing inferences").

However, if an adequate expert report has not been served within the period specified by statute because elements of the report are found deficient, the court may grant one thirty-day extension to the claimant to cure the deficiency. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). Where a report is not "so deficient as to constitute no report at all," a plaintiff is entitled to remand of the case to the trial court to consider

granting an extension to cure.  *See Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 670-71 (Tex. 2008) (citing *Ogletree v. Matthews*, 262 S.W.3d 316, 323 (Tex. 2007) (Willett, J., concurring); *Lewis v. Funderburk*, 253 S.W.3d 204, 211 (Tex. 2008) (Willett, J., concurring)).

In the instant case, we cannot say that Anderson's expert reports are "so deficient as to constitute no report at all."  *See Gardner*, 274 S.W.3d at 670; *see also Leland v. Brandal*, 257 S.W.3d 204, 207-08 (Tex. 2008).  Nevertheless, Anderson's expert reports are deficient with respect to the element of causation.  And under these circumstances, Anderson is entitled to remand.  *See Gardner*, 274 S.W.3d at 670; *see also Leland*, 257 S.W.3d at 207-08; *Wallace*, 271 S.W.3d at 441; *see also Judalet*, 2009 Tex. App. LEXIS 7404, at *14.

## V.     CONCLUSION

In summary, we sustain appellant's sole issue on appeal, reverse the trial court's order denying appellant's motion to dismiss, and remand this cause for consideration of whether the deficiency in Anderson's expert reports can be cured, and thus, whether to grant an extension of time.  *See Samlowski v. Wooten*, 332 S.W.3d 404, 411-13 (Tex. 2011) (noting that the trial court is in the best position to decide whether a cure is feasible).


AL SCOGGINS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Reversed and remanded
Opinion delivered and filed October 19, 2016
[CV06]

