

# NUMBER 13-18-00667-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

KIMBERLEY JAYNE BAKER,

                                                                                          Appellant,

v.

CHIVA MARIA CHAPA, INDIVIDUALLY
AND AS PARENT AND NEXT FRIEND
OF B.Q., A MINOR AND BRANDON
QUINTANILLA SR., AS PARENT AND
NEXT FRIEND OF B.Q., A MINOR,                                   Appellees.

On appeal from the 319th District Court
of Nueces County, Texas.

# MEMORANDUM OPINION

Before Chief Justice Contreras and Justices Hinojosa and Perkes
Memorandum Opinion by Justice Hinojosa

Appellant Kimberley Jayne Baker appeals the trial court's order denying her motion to dismiss a healthcare liability claim brought by appellees Chiva Maria Chapa, individually and as parent and next friend of B.Q., a minor; and Brandon Quintanilla, Sr., as parent and next friend of B.Q., a minor. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9). In one issue, Baker argues that the trial court erred in overruling her objections to appellees' expert report and in denying her motion to dismiss under the Texas Medical Liability Act (TMLA). *See id*. § 74.351. We affirm.

## I. BACKGROUND[1]

Chapa, who was thirty-one weeks pregnant with B.Q. and had previously been diagnosed with a complete placenta previa,[2] presented to Christus Spohn Corpus Christi–South Hospital (Spohn South) on August 7, 2008, complaining of vaginal bleeding. Ira J. Murphy, M.D. admitted Chapa for overnight observation and discharged her the next morning. Chapa returned to Spohn South on August 8, complaining of ruptured membranes. Baker, a labor and delivery nurse, attended to Chapa at 5:15 p.m. After confirming that Chapa and B.Q. were stable, Baker summoned Terry Robert Groff, M.D., the on-call obstetrician-gynecologist. Dr. Groff examined Chapa at 6:15 p.m. and ordered that Chapa undergo an urgent, or within-the-hour, cesarean section. Baker's shift ended at 7:00 p.m.

---

[1] We derive the factual background from the pleadings and expert reports. *See Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 456 n.5 (Tex. 2017).

[2] Placenta previa "occurs when a baby's placenta partially or totally covers the mother's cervix—the outlet for the uterus. Placenta previa can cause severe bleeding during pregnancy and delivery." *Placenta Previa*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/placenta-previa/symptoms-causes/syc-20352768 (last visited Nov. 16, 2020).

Chapa began experiencing heavy vaginal bleeding at approximately 7:30 p.m., at which time she was immediately prepped for a cesarean section. Dr. Groff performed the surgery and delivered B.Q. at approximately 7:52 p.m. B.Q. was born profoundly anemic and required blood transfusions. As a result, he suffered permanent neurological injuries.

Appellees filed health care liability claims against Baker, Dr. Groff, Dr. Murphy, and Spohn South. In their suit, appellees alleged that B.Q. suffered injuries due to the negligence of the defendants.[3] With respect to Baker, appellees alleged that she failed to "appreciate and correctly act on [Chapa's] history and condition upon presentation," failed to "advocate for and obtain a safe expedited delivery by C-section," and failed to "invoke the chain of command in response to Dr. Groff's contraindicated orders that resulted in a delayed delivery."

Appellees served Baker with an expert report and three supplemental reports by Michael C. Cardwell, M.D. We summarize Dr. Cardwell's opinions pertaining to Baker as follows:

- Standard of Care: Obstetrical nurses must understand the signs and symptoms of potential threats to maternal and fetal well-being and ensure that timely intervention occurs. Baker had a duty to identify conditions that would require urgent intervention by an obstetrician. When a patient presents with a known central placenta previa, premature rupture of membranes, a recently completed course of antenatal steroids with a booster injection, a prior cesarean section, and a gestational age of 30 plus weeks, the standard of care requires ensuring urgent delivery, which means within an hour. Baker was required to immediately contact an available obstetrician so that there would be sufficient time for Chapa to be prepped and transported to an available operating room for delivery within the

---

[3] Appellees initially filed suit on October 6, 2010. Appellees did not name Baker as a defendant until January 17, 2018, when appellees filed their Fourth Amended Petition. Of the defendants, only Baker is a party to this appeal.

hour. Baker was required to prepare Chapa for cesarean section, call for an operating room and all necessary personnel to be available, and assemble the team in the operating room within an hour of admission.

- Breach: By 5:17 p.m., Baker had all of the information and assessment available to her to understand her duty to ensure an urgent delivery. Baker breached the standard of care by failing to: (1) immediately get an obstetrician to Chapa's bedside, as opposed to an hour after assessment; (2) immediately prepare Chapa for surgery, (3) call for an operating room and all necessary personnel to be available, and (4) assemble the team in the operating room within an hour of admission. The record does not reflect any effort by Baker to move toward a cesarean section delivery during the entirety of her attendance with the patient through the end of her shift. Baker again breached the standard of care by failing to take these actions even after Dr. Groff ordered an urgent cesarean section delivery at 6:15 p.m.

- Causation: If Baker had immediately secured the attendance of an obstetrician, the plan for an urgent delivery would have been entered sooner. If delivery had been completed by 6:19 p.m., the terminal bleeding episode after 7:00 p.m. would not have occurred before delivery, and B.Q. would have avoided blood loss due to that event. As a result of a timely delivery, B.Q. would not have been born profoundly anemic and would not have suffered permanent neurological injury. Due to the delay in accomplishing the urgent cesarean delivery, B.Q was deprived of oxygen-rich cerebral circulation, causing his brain cells to die. Further, if Baker had moved toward delivery after Dr. Groff's 6:15 p.m. note and plan for urgent delivery, the urgent cesarean section delivery would have been accomplished, to a reasonable degree of medical certainty, before the terminal bleeding episode occurred.

Baker filed objections to Dr. Cardwell's reports and a motion to dismiss appellees' claims pursuant to § 74.351(b) of the TMLA. *Id*. § 74.351(b). Baker argued that the expert reports failed to provide a fair summary of the applicable standard of care and how it was breached and that the reports failed to adequately link the alleged breaches to appellees' injuries. *See id*. § 74.351(r)(6). Following a hearing, the trial court signed an order denying

4

Baker's motion to dismiss. This interlocutory appeal followed. *See id.* § 51.014(a)(9).

## II.    STANDARD OF REVIEW & APPLICABLE LAW

The TMLA requires a plaintiff bringing a healthcare liability suit against a health care provider to timely file and serve an expert report providing:

> [A] fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6); *see Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011).

Should a defendant health care provider file a motion challenging the adequacy of an otherwise timely report, "the court may grant the motion 'only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the [TMLA's] definition of an expert report.'" *Baty v. Futrell*, 543 S.W.3d 689, 692–93 (Tex. 2018) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l)). To constitute a good faith effort, the report must (1) inform the defendant of the specific conduct forming the basis of the claim and (2) provide an evidentiary foundation for the trial court to conclude that the claim has legal merit. *Baty*, 543 S.W.3d at 693–94; *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam).

"While the plaintiff is not required to prove her claim with the expert report, the report must show that a qualified expert is of the opinion she can." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). "No particular words or formality are required, but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 556; *see Zamarripa*, 526 S.W.3d at 460. Courts review the sufficiency of the

5

expert report by looking within the four corners of the report. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam) (citing *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001)).

An appellate court reviews the trial court's ruling on the adequacy of an expert report and denial of a motion to dismiss for an abuse of discretion. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 512 (Tex. 2017) (per curiam). A trial court abuses its discretion when it makes a decision without using guiding rules or principles. *Id*. at 512–13.

## III. DISCUSSION

In her sole issue, Baker argues that the trial court abused its discretion by overruling her objections and denying her motion to dismiss because appellees' expert report failed to comply with the TMLA. Specifically, Baker argues that Dr. Cardwell's expert reports are inadequate because his opinions concerning standard of care, breach, and causation are "insufficient and conclusory."[4]

### A. Standard of Care & Breach

Baker argues that Dr. Cardwell's standard of care and breach opinions are "conclusory, speculative, require[] the Court to draw impermissible inferences, and/or

---

[4] Appellees argue that many of Baker's arguments are either waived or unpreserved because they were not raised in Baker's objection to Dr. Cardwell's initial expert report but were raised for the first time in objections to the supplemental reports or on appeal. We disagree. With each successive supplemental expert report, Dr. Cardwell's opinions concerning the standard of care, breach, and causation were further developed and articulated. As a result, Baker filed additional objections to each supplemental report. These objections were timely made as they were filed within twenty-one days of the date the supplemental reports were served. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *Humble Surgical Hosp., LLC v. Davis*, 542 S.W.3d 12, 20 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Furthermore, Baker's appellate arguments are preserved for review as they are sufficiently similar to her trial court objections. *See* TEX. R. APP. P. 33.1(a); *Humble*, 542 S.W.3d at 20.

attempt[] to impose a standard of care greater than that required by law."

The applicable standard of care is defined by what an ordinarily prudent health care provider would have done under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880; *Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 747 (Tex. App.— Houston [14th Dist.] 2011, no pet.). To adequately identify the standard of care and breach thereof, an expert report must set forth "specific information about what the defendant should have done differently." *Abshire*, 563 S.W.3d at 226 (citing *Palacios*, 46 S.W.3d at 880). While the TMLA requires only a "fair summary" of the standard of care and how it was breached, the report must set out what care was expected but not given. *Id*. An expert's articulated standard of care for nurses cannot require the practice of medicine, because nurses are prohibited from doing so under Texas law. *See* TEX. OCC. CODE ANN. §§ 155.001–.003 (providing that no person may "practice medicine" without a medical license); *id*. § 151.002(a)(13) ("'Practicing medicine' means the diagnosis, treatment, or offer to treat a mental or physical disease or disorder . . . or injury. . . ."); *id*. § 301.002(2), (4)–(5) (barring nurses from "acts of medical diagnosis or the prescription of therapeutic or corrective measures"); *Zamarripa*, 526 S.W.3d at 461 n.36.

Dr. Cardwell identified concrete steps that were required by the standard of care, but which Baker failed to perform. According to the reports, the standard of care for an obstetric nurse caring for a patient in Chapa's condition—central placenta previa, premature rupture of membranes, a recently completed course of antenatal steroids, a prior cesarean section, and a gestational age of 30 plus weeks—requires that the nurse immediately contact an available obstetrician, prepare the patient for cesarean section,

7

call for an operating room and all necessary personnel to be available, and assemble the team in the operating room within an hour of admission. The reports note that Baker failed to immediately contact an obstetrician, did not have an obstetrician to bedside until an hour after admission, and failed to accomplish any of the tasks that would have facilitated an urgent delivery. These statements are not conclusory. Rather, they identify specific actions that should have been taken but were not. *See Abshire*, 563 S.W.3d at 226.

Further, we disagree that the articulated standard of care impermissibly required the practice of medicine by a non-physician. Rather, the expert reports identify specific actions that do not require diagnosis or treatment. *See* TEX. OCC. CODE ANN. § 151.002(a)(13). While Baker is not authorized to order a cesarean section or to perform the operation, she is not prohibited from taking actions to ensure that the procedure can be accomplished in a timely manner. *See Tenet Hosps. Ltd. v. De La Rosa*, 496 S.W.3d 165, 172 (Tex. App.—El Paso 2016, no pet.) (concluding that the expert report was sufficient where the standard of care required a nurse to timely and personally notify the physician or physician assistant of a significant change in the patient's condition); *Renaissance Healthcare Sys. v. Swan*, 343 S.W.3d 571, 586 (Tex. App.—Beaumont 2011, no pet.) (concluding expert report sufficiently articulated a standard of care which required nursing personnel to recognize the signs of hemorrhage, summon a physician to patient's bedside, and institute the chain of command); *Tenet Hosps. v. Barnes*, 329 S.W.3d 537, 542–43 (Tex. App.—El Paso 2010, no pet.) (holding that the expert reports adequately articulated the standard of care where the report stated that the nurse should have immediately notified the physician that the patient's blood pressure was low

8

following an angiogram); *see also Columbia Med. Ctr. of Arlington v. Shelby*, No. 05-17-01358-CV, 2018 WL 6187437, at *8 (Tex. App.—Dallas Nov. 27, 2018, no pet.) (mem. op.) (concluding that expert report faulting the nurses' failure to notify doctors of symptoms they observed or to initiate the chain of command did not require the nurses to diagnose the patient's condition or to practice medicine); *Columbia Plaza Med. Ctr. of Fort Worth v. Jimenez*, No. 02-15-00275-CV, 2016 WL 2586738, at *4–5 (Tex. App.—Fort Worth May 5, 2016, no pet.) (mem. op.) (concluding that the expert report properly articulated the standard of care for hospital staff which required that they observe, monitor, and recognize symptoms or conditions).

Finally, Baker maintains that Dr. Cardwell's reports lack a reliable factual basis because they impose an impractical time period for a nurse to comply with the standard of care. This argument, however, goes to the believability of Dr. Cardwell's opinions, which is an issue that "should be litigated at a later stage of the proceedings." *Abshire*, 563 S.W.3d at 226. It was Dr. Cardwell's considered expert opinion that the standard of care required Baker to accomplish the identified tasks so that a cesarean section delivery could take place within an hour of admission; the credibility of Dr. Cardwell's opinion in this regard is simply not an issue at this stage of the litigation. *See id*.

For the foregoing reasons, we conclude that Dr. Cardwell's expert reports provide a fair summary of the standard of care and how it was breached. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Abshire*, 563 S.W.3d at 226; *De La Rosa*, 496 S.W.3d at 172; *Barnes*, 329 S.W.3d at 542–43.

9

**B.      Causation**

Next, Baker argues that Dr. Cardwell's causation opinions are "insufficient and conclusory." The causation element requires that the expert explain "how and why" the alleged negligence caused the injury in question. *Abshire*, 563 S.W.3d at 224 (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)). A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts. *Id*.; *see also Zamarripa*, 526 S.W.3d at 461 ("[W]ithout factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which . . . are clearly insufficient."). In satisfying this "how and why" requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Zamarripa*, 526 S.W.3d at 460. "Proximate cause has two components: (1) foreseeability and (2) cause-in-fact." *Id*. A negligent act or omission is the cause-in-fact of the harm if it has been a substantial factor in bringing about the harm, and but for the act or omission, the harm would not have occurred. *Id*.

Baker contends that Dr. Cardwell failed to explain "how Baker complying with the applicable standard of care would have resulted in B.Q.'s delivery before 7:30 p.m.," when Chapa's "terminal bleeding episode" occurred. According to Baker, Dr. Cardwell's causation opinion is directly contradicted by the fact that Dr. Groff ordered merely an urgent—within-the-hour—cesarean section when he examined Chapa at 6:15 p.m., as opposed to an "emergent" or immediate cesarean section. Baker contends that Dr. Cardwell fails to explain how Baker could have done anything that would have altered Dr.

Groff's course of treatment. Baker notes that Dr. Groff did not order an emergent cesarean section until after Chapa's bleeding episode at 7:30 p.m., which was after Baker's shift ended.

We disagree that Dr. Cardwell's causation opinion fails to properly account for these events. With respect to Dr. Groff's 6:15 p.m. order for an urgent delivery, Dr. Cardwell opines that had Baker immediately secured the attendance of an obstetrician, the plan for an urgent delivery would have been entered sooner, and the delivery would have taken place as soon as 6:19 p.m., well before Chapa's bleeding episode. Dr. Cardwell notes that had the surgery occurred at any time before 7:30 p.m., B.Q. would have avoided blood loss, would not have been born profoundly anemic, and would not have suffered permanent neurological injury. Dr. Cardwell further addresses causation with respect to Baker's breaches of the standard care *following* Dr. Groff's 6:15 p.m. order. According to Dr. Cardwell, had Baker accomplished the identified tasks required to prepare Chapa for surgery after the order was entered, the procedure would have been accomplished prior to the terminal bleeding episode.

We believe that Dr. Cardwell's causation opinion is at least as strong as the expert opinion examined by the Texas Supreme Court in *Abshire*. *See* 563 S.W.3d 219. In that case, the Court examined a causation opinion concerning the nursing staff's failure to recognize and document a patient's osteogenesis imperfect (OI), also known as brittle bone disease, and to recognize the symptoms of a spinal compression fracture. *Id*. at 224–26. The patient's expert opined that the failure of the nursing staff to document a complete and accurate assessment resulted in a delay in proper medical care that would

11

have included the ordering of imaging studies and protection of the spine. *Id*. at 224. The expert explained that the nursing staff should have linked the patient's symptoms to her OI diagnosis, which would have resulted in the patient's admission to the hospital on absolute bed rest and the receipt of treatment to preserve the integrity of the spine. *Id*. According to the expert, these failures lead to the exacerbation of an undiagnosed vertebral facture which resulted in paralysis. *Id*. at 225.

The Court concluded that the expert's "explanation provides a straightforward link between the nurses' alleged breach of the standard of care and [the patient's] spinal injury." *Id*. The Court elaborated that "the report draws a line directly from the nurses' failure to properly document [the patient's] OI and back pain, to a delay in diagnosis and proper treatment (imaging of her back and spinal fusion), to the ultimate injury (paraplegia)." *Id*. Accordingly, the Court held that the report provided a fair summary of the causal relationship between the defendant's breach and the patient's injury. *Id*. at 226.

Like the expert opinion in *Abshire*, Dr. Cardwell's report provides a straightforward link between Baker's alleged breaches of the standard of care and appellees' injuries. Dr. Cardwell draws a direct line from Baker's failure to immediately contact an obstetrician and prepare the patient for surgery, to the delayed cesarean section delivery, to the ultimate injury—B.Q.'s permanent neurological injuries. *See id*. at 225. Baker's arguments to the contrary speak to the believability of Dr. Cardwell's opinion. However, the sole inquiry at this stage of the proceedings is whether the expert has explained how the negligent conduct caused the injury—not whether such an explanation is believable. *See id*. at 226. Accordingly, we conclude that Dr. Cardwell's reports provide a fair summary of

12

the causal relationship between Baker's breaches of the standard of care and appellees' injuries. *See id.*; *see also Zamarripa v. Columbia Valley Health Care Sys., L.P.*, No. 13-18-00231-CV, 2019 WL 962085, at *6–7 (Tex. App.—Corpus Christi–Edinburg Feb. 28, 2019, pet. denied) (mem. op.) (following *Abshire* and concluding that the expert's opinion on causation complied with the TMLA where the expert opined that the nurses' breaches of the standard of care deprived the physician of information that was necessary to his decision on whether or not to order a non-emergency transfer).

## D.     Summary

We conclude that Dr. Cardwell's export report satisfies the requirements of the TMLA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351; *Abshire,* 563 S.W.3d at 224. Therefore, the trial court did not abuse its discretion in overruling Baker's objections and denying her motion to dismiss. *See Miller*, 536 S.W.3d at 512. We overrule Baker's sole issue.

## IV.     Conclusion

We affirm the trial court's order.

LETICIA HINOJOSA
Justice

Delivered and filed the
10th day of December, 2020.

13